**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

**THOMAS STALLINGS,**
          **Plaintiff,**

                                   **Case No. 07-1387-WEB-KMH**

**vs.**

**WERNER ENTERPRISES, INC., and
STUART J. COHEN,**
          **Defendants.**

**PLAINTIFF'S  RESPONSE TO DEFENDANT WERNER ENTERPRISES, INC.'S
MOTION  FOR PARTIAL SUMMARY JUDGMENT ON  PLAINTIFF'S
CLAIM  FOR NEGLIGENT HIRING AND RETENTION**

       Comes now the plaintiff, Tom Stallings, by and through his attorney, Brad Prochaska of

Prochaska, Giroux, & Howell, and states that there is a genuine issue of material fact which

provides a sufficient reason to deny defendant's motion.

**INTRODUCTORY STATEMENT**

       There are many facts that were not disclosed by defendant in its motion. Additional facts

are presented by the plaintiff below. These additional facts show the defendant negligently hired

and negligently retained Stuart Cohen.

       Under Kansas law, the plaintiff can make a claim for negligent hiring and negligent

retention even when the defendant has admitted vicarious liability.

**PLAINTIFF'S  RESPONSES  TO DEFENDANT'S
STATEMENT  OF UNDISPUTED  MATERIAL  FACTS**

1.      Admitted.

2.      Admitted.

3.      Admitted.

4.      Admitted in part and denied in part. Plaintiff admits that defendant Werner has admitted it is "vicariously liable."  Plaintiff's denial is based on plaintiff not being certain about what defendant means by "vicariously liable." As of today, both defendants deny Cohen was negligent or at fault (See defendants' Answer to Plaintiff's Second Amended Complaint, paragraphs 10, 11, 14, and 21).  Werner has not admitted "vicarious liability" for damages resulting to plaintiff from the collision.  (See Exhibit No. 1)

5.      Admitted.

6.      Admitted in part, denied in part. The truck consists of two parts, a tractor and a trailer. The tractor was owned by Cohen. The trailer was owned by Werner.(See Werner's First Amended Answer to Interrogatory # 2 marked as Exhibit 2)

**INTERROGATORY NO.2:**
(a) State the name and address of the owner of the trailer:
**ANSWER:** Werner Enterprises, Inc. P.O. Box 45308 Omaha, NE 68145, c/o Coffey, Gudgel & McDaniel, 4725 East 91st Street, Tulsa, Oklahoma.

7.      Admitted.

8.      Admitted.

9.      Admitted.

10.     Admitted.

11.     Admitted in part, denied in part. This fact does not specify the extent of the review nor how often, only that some form of review was done.

12.     Admitted in part, denied in part. "Investigated" only in terms of who were the past employers, but no inquiry was made as to why Cohen "quit" his prior jobs.

13-15.  Admitted

16.     Admitted in part, denied in part. The drug test was only taken upon hiring, but none were done in the subsequent six years of Cohen's driving for Werner. (Exhibit 3)

> Q.  And did you know you were going to get drug tested
>         for Werner before they would hire you on?
> A.  Yes.
> Q.  And how did you know that?
> A.  It's standard hiring practice in this particular
>         field.
> (S. Cohen, pp 49, ll. 23-25 to pp 50, ll. 1-3)

> Q.  So other than the Breathalyzer, is it correct in the
>     next seven years they did not test your blood or
>     your urine or your breath?  Randomly.
> A.  As far as I can recall, yes.
> Q.  Now, I said randomly.  Even non-randomly, there was
>     never another test of you for seven years other than
>     the Breathalyzer.
> A.  As far as I can recall, yes.
> Q.  And the Breathalyzer, do you know what year that
>     would have been in?  Is it the first year?  The
>     second year?
> A.  I believe the second year.
> (S. Cohen, pp. 63, ll 17-25 to pp 64, ll. 1-3)

17-18.  Admitted

19-32.  Denied. See Cohen's deposition testimony below  in paragraph 6 of Plaintiff's additional
facts in which Cohen contradicts these assertions (Exhibit 3).

<u>**PLAINTIFF'S  ADDITIONAL  STATEMENTS  OF  FACT**</u>

Pursuant to Rule 56.1, Plaintiff submits his additional statement of undisputed material

facts. These material facts provide the Court with overwhelming evidence of negligent hiring and

retention.  This is primarily based on Cohen's accident and traffic ticket history from 1997 to the

date of the collision, 12-27-07.  Stuart Cohen had twenty-five unsafe incidents in nine years. Since

his hiring in July of 2000, Werner placed Cohen on probation four times and suspended him twice

for his erratic and unsafe driving. After being placed on his one year probation with a thirty-day

suspension without pay, Cohen then incurred six more speeding tickets and four more chargeable

accidents without being terminated. All of Cohen's tickets and accidents were known by Werner

and were documented in Werner's files.

<u>**Deposition Testimony of Della Sanders,  Defendant Werner's**</u>
<u>**Vice President of Safety and Compliance**</u>

**1.**      **Della Sanders testified in her deposition as follows (Exhibit 4)**

Q.   Okay.  Is one item, though, that they can
       terminate or fire without getting Mr. K's  permission
       is if they think the driver has a bad enough track
       record and appears to be unsafe enough that they
       have decided he out to be terminated or fired?
A.   That would probably require consultation
       with Mr. Kochenderfer.
(D. Sanders, pp 12, ll 6-12)


Q.   And does an annual review mean Mr. Cohen
       gets a review approximately every year?
A.   Yes.
Q.   And do you know if he had five annual
       reviews or six, do you know one way or the other?
A.   I don't recall.
Q.   It's either five or six is what it out to
       be?
A.   If he was employed 2000 to 2006, depending
       on the time frames there, five or six would be
       correct, yes.
 (D. Sanders, pp 22, ll 16-25 to pp 23, ll. 1)


Q.   But do all the safety managers,
       specialists, coordinators and Mr. K All know that
       suspensions and probations are in the computer?
A.   Yes.
Q.   And do they all have access to the
       computer?
A.   Yes.
Q.   So as a part of each annual review, they
       know they can check suspensions and probations on
       the computer?
 A.   It's available, yes.
(D. Sanders, pp. 23, ll. 18-25 to pp 24, ll. 1-3)


Q.   When they do the annual review, if I was
       to lop together all the information to be of
       considered, it would be the MVR, that's one, right?
A.   Yes.
Q.   Does it also mean they can review the DQF?
A.   Yes.
Q.   And what's in the computer?
A.   Correct.

Q.   And whatever the driver tells them?
A.   Yes.
Q.   And whatever the driver filled out in the
      form he fills out?
A.   Which would be the violation of review,
      yes.
(D. Sanders, pp. 27, ll. 11-24)


Q.   Yes.  If the safety manager, safety
      specialist or safety coordinator was deciding
      whether to terminate or recommend terminating Mr.
      Cohen and wanted all the information, they know they
      could get it all here by looking at the computer?
A.   Yeah.
(D Sanders, pp. 29, ll. 20-25)


Q.   Are you aware that the trailer he was
      hauling was owned by Werner?
A.   Yes.
Q.   And has Werner in the past decided that
      they do not want to give the trailer to an
      independent contractor and let them haul any more
      because you're concerned about his driving?  And not
      give him the trailer without terminating him?
 A.   The practice in general isn't really
      related to the trailer.  If -- if there were
      concerns with the driver's performance, safety
      performance, we could terminate the contract.
(D. Sanders, pp 34, ll. 1-12)


 Q.   Are you saying that
      the corporate safety managers involved in Mr.
      Cohen's computer printouts could give suspensions and
      probations without Mr. Kochenderfer's approval and permission
      first?
A.   They may, yes.
Q.   If they wanted to instead terminate Mr.
      Cohen instead of giving those probations and
      suspensions, they would have to get permission first
      from Mr. K?
A.   Yes.
(D. Sanders, pp. 39, ll. 21-25 to pp. 40, ll. 1-6)

Q.  If Mr. Cohen is to get disciplined for too
      many traffic accidents, are the two forms of
      discipline probation and suspension?
A.  It may also be termination.
Q.  But for too many traffic citations, is
      suspension and probation not the usual discipline,
      it's usually just termination?
A.  It may be suspension or termination.
Q.  Okay.  So -- but probation usually is not
      one of the choices for an accumulation of too many
      traffic tickets, it's either suspension or
      termination?
A.  In general, yes.
(D. Sanders, pp. 48, ll. 16-25 to pp. 49, ll. 1-3)

Q.  Okay.  Well, citations and accidents,
      those are two criteria that you know would be looked
      at, correct?
A.  Each case would be reviewed individually.
(D. Sanders, pp. 50, ll. 12-15)

Q.  Okay.  But in citations, do you, Werner,
      use as a guideline three moving in a three-year
      period as a guideline?
A.  For hiring.
(D. Sanders, pp. 57, ll. 5-8)


Q.  So do you believe that one of the
      considerations as to whether to terminate Mr. Cohen
      or not should include his four probations and two
      suspension?...
Q.  Meaning they should be considered by
      Werner. ...
A.  As I testified earlier, the amount of --
      all of the driver's information would be taken into
      context and considered with his amount of miles that
      he has driven with Werner
(D. Sanders, pp. 59, ll. 13-19, 20, 22-25)

      So would it be correct that in
      considering whether to terminate Mr. Cohen or not,
      Werner does not have a guideline for either the
      number of tickets, the number of accidents or the
      time period they incur in, there is no guideline for
      any of those three criteria?

6

A.   As I testified earlier, the guidelines
would be to review each incident individually.  I
don't recall a set number or a set time frame.  It's
not black and white.  Each one would be reviewed in
the entire context.
(D. Sanders, pp. 68, ll. 24-25 to pp. 69, ll. 1-9)


**Deposition Testimony of Della Sanders,**
**Defendant Werner's Vice President of Safety and Compliance**
**From the *Banks v. Werner Enterprises*, Case No. #CV-2007-032, August 20, 2008**


2.    **Della Sanders testified in her deposition as follows:**(See Exhibit 5)


How
many traffic violations can a prospective Werner
driver have and still be hired by Werner?
A  The --
Q  (By Mr. Reddick)  You know what I'm
saying?  I don't want to confuse you.  How many --
what's the threshold for hiring a driver with
regard to traffic citations?  How many are
allowed, I guess, is the better question.
A  The criteria the recruiting department
uses would be three -- no more than three moving
in three years --
Q   Okay.
A    -- or three in a 12-month period.
Q   Okay.  Would you agree that there are at
least three moving violations within three years
prior to his hire in March of '07?
A   Not more than three, but there are
three, yes.
(D. Sanders, pp51, ll. 17-25 to pp 52, ll. 1-12)


**Deposition testimony  from Defendant  Werner's**
**Assistant Director of Safety, Jim Kochenderfer**


3.    **Jim Kochenderfer testified in his deposition as follows** (See Exhibit 6):

Q.  Can the safety specialist and safety
manager, if they don't have questions or concerns
with Mr. Kochenderfer, do they then have the
authority to keep him as a Werner driver?
A.  Yes.
(J.Kochenderfer, pp.15, ll. 16-20)

Q.   And one year's probation, is that the
      maximum amount of probation?
A.   Yes.
Q.   And the 30-day suspension, is that the
      maximum amount of suspension?
A.   Yes.
(J.Kochenderfer, pp 33, ll. 9-14)


Q.   And in 30 days of unpaid suspension, is
      that the maximum suspension for no pay?
A.   Yes.
Q.   So was this the most severe suspension and
      probation you can give Mr. Cohen not counting the
      training probation suspension?
A.   Yes.
Q.   And would I gather that there must have
      been a significant infraction that you think he
      committed to deserve such a suspension and probation?
A.   Yes.
(J. Kochenderfer, pp. 34, ll. 15-25)


Q.   Do you tend to usually see if there's
      previous suspensions or probation when you conduct
      your accident review to see if they violated the
      probation or suspension?
A.   Yes.
(J. Kochenderfer, pp. 35, ll. 5-9)


Q.   Would you have also considered the number
      of traffic citations at the time this accident
      review?
A.   I may have.
Q.   And would you also have considered his
      employment history even before he got hired at
      Werner?
A.   I may have.
(J. Kochenderfer, pp. 36, ll. 8-15)


Q.   Is the only thing you could have done more
      harshly to Mr. Cohen would be terminating him as a
      driver?
A.   Are we speaking in regards to 00819?
Q.   Yes, sir.
A.    I could have suspended him from training

    indefinitely or permanently.
Q.  Other than that, would the next step be
    termination?
A.  Yes.
Q.  Are you able to tell me why he was not
    terminated?
A.  No.
(J. Kochenderfer, pp 37, ll. 10-22)


A.  The 30 days of unpaid suspension, that is
    not a disciplinary suspension.
(J. Kochenderfer, pp 39, ll. 4-5)


Q.  Are you hoping there might be some benefit
    to Werner and Mr. Cohen by giving him these
    probation -- this probation and suspension?  I mean,
    what do you hope will be the beneficial outcome to
    this?
A.  That Mr. Cohen will not be involved in any
    accidents or incident in the future.
Q.  And is part of the reason do you that
    because you don't want him involved in any accidents
    in the future?
A.  Yes.
Q.  Including injury accidents?
A.  Yes.
(J. Kochenderfer, pp. 39, ll. 17-25 to pp. 40, ll. 1-4)


Q.  Would you expect based on company routine
    and practice that he would have learned in the
    course of his review about his probation and
    suspension?
A.  Yes.
(J. Kochenderfer, pp. 40, ll. 12-16)


Q.  Are you able to tell me why Mr. Blaisdell
    did not fire Mr. Cohen during this accident?
A.  No.
(J. Kochenderfer, pp. 41, ll. 3-5)


Q.  Do you know of any criteria or guideline
    that Werner uses as of 10-19-06 that says if have
    you this amount of traffic tickets or this amount of

accidents or this amount of probations with
suspensions, the driver should be terminated?
A.   No.
(J. Kochenderfer, pp. 44, ll. 1-6)


Q.   And is it correct that you terminated Mr.
Cohen without having to get approval from anyone
else?
A.   That is correct.
Q.   Is it correct that in your two accident
reviews you kept Mr. Cohen employed without getting
permission from anyone else?
A.   That is correct.
Q.   You had authority to keep him in Werner's
-- keep him as a Werner truck driver and you
had authority on your own to terminate him?
A.   Yes.
(J. Kochenderfer, pp. 53, ll. 17-25 to pp. 54, ll. 1-3)


Q.   And are you, is part of your job
responsibility with Werner to screen truck drivers
and decide which ones are too unsafe to be truck
drivers for Werner?
A.   Are we talking about existing drivers?
Q.   Yes.
A.   Currently employed by Werner Enterprises?
Q.   Yeah, or driving for them as independent
contractors.
A.   That's correct.
(J. Kochenderfer, pp. 55, ll. 5-14)


Q.   And do you believe in that during the
accident reviews the amount of citations and traffic
accidents were probably learned by the people who
conducted the accident reviews and annual reviews?
A.   Yes.
Q.   Would that knowledge go -- would that
information be all the way back to when Mr. Cohen
was first hired in the year 2000?
A.   I would expect Mr. Cohen would have an
annual review for every year of his employment.
(J. Kochenderfer, pp. 55, ll. 25 to pp. 56, ll. 1-9)

Q.   Last thing, on the probations, is there
      any warnings or terms given to Mr. Cohen, for
      example, when you gave him the one year's probation,
      is it your routine to say if do you this or you do
      that, you will be terminated?
A.   It is not.
Q.   Okay.  What is it that you would typically
      have told him for that one year's probation?
A.   Typically a driver would be told that
      probation is simply a way to be put on notice that
      traffic accidents are unacceptable.
Q.   Okay.  Would it be correct then that to
      the best of your knowledge, in all of his accident
      reviews and annual reviews in which he got a
      probation or suspension, probably was not told that
      if you do this or you do that, you will be fired?
A.   I couldn't say.
Q.   Okay.  At least you think for yourself you
      probably didn't give him that warning?
A.   I couldn't say.
(J. Kochenderfer, pp. 57, ll. 3-22)


**<u>Deposition testimony of Defendant Werner's</u>**
**<u>Terminal Driver Coordinator, Kimberly Horrie</u>**

**4.**      **Kimberly Horrie testified in her deposition as follows** (See Exhibit 7)**:**


Q.   So you said you see something on the screen.
      What is it that you see on the screen
A.   You can see what other people in the past did
      with the accident reviews or annual reviews, just like
      this document I have in front of me, and you can --
Q.   How many of those annual reviews can you see on
      the screen?
A.   All of them.
Q.   So every time anyone does an annual review, does
      it pop -- do all the previous annual reviews pop up on the
      screen?
A.   Well, we can look the annual reviews up, yes.
(K. Horrie, pp. 18, ll. 5-16)


Q.   Okay.  So if I understand you right, if you want
      to, you can look at the previous annual reviews and see if
      the driver has had prior traffic tickets or accidents?

A.   Yes.
Q.   And, also, you can then learn if the driver has
       been on probation or suspension previously?
A.   Yes.
(K. Horrie, pp. 22, ll. 18-24)

**Deposition Testimony of Defendant Werner's Safety Expert, Mr. Sievers**

5.      **Mr. Sievers testified in his deposition as follows:**   (See Exhibit 8)

       I think I requested that [*Cohen's disciplinary record*] because I
       think up until a point in time when I was reviewing
       his, his being Mr. Cohen's, driver qualification
       file, I asked Mr. McDaniel or Mr. Coffey that surely
       there is some discipline involved, and so I don't
       know how they asked for it, but yeah, at some point
       before I finalized my report I received these
       documents.
(A. Sievers, pp. 19, ll. 4-11)

6.      **Mr. Sievers testified in his deposition that Cohen got an 11-16-06 speeding ticket
        that is not on plaintiff expert Art Atkinson's list** [*in paragraph 10 below*].

 A.      And so that's ten.  And then number 11  I
         have is 11/16/2006, that's 11, and I don't think he
         has that one.
 Q.      Okay.  And that is a speeder?
 A.      A speed, yes.
(Dep of Sievers, pg. 98   lines 5-9)   (Exhibit 8)

**Evidence  from the truck driver, Cohen**

7.      **Cohen's testified in his deposition as follows:**   (Exhibit 3)

 Q.  In the entire seven years, including your
       orientation, did anyone from Werner ever tell you
       that they were concerned about the amount of
       accidents you had been in?
 A.  No.
 Q.  Did anyone from Werner in the entire seven years,
        including orientation, ever say anything to you that
        they were concerned about the amount of tickets
        you'd accumulated?

A. No.

Q. Okay. But as far as you know, they knew all of that and never said anything to you about it.

A. Right.

Q. Okay. Do you know if there was someone at Werner that if the amount of tickets or accidents gets too many there is a person who would approach the driver to let them know there's a problem?

A. No.

(S. Cohen, pp. 83, ll. 3-20)


Q. And did any of them accumulate a lot of tickets or have some serious accidents where they expressed to you a concern about their relationship with Werner?

A. No.

Q. So just asking for your concerns, were you ever concerned that the amount of tickets you got might affect your employment or owner-operator relationship with Werner?

A. No.

Q. Did you ever think they would get upset by that and tell you you couldn't drive for them anymore?

A. No.

Q. That question pertains to both your tickets and your accidents. You were never worried they would think you accumulated too many and you would be an unsafe driver.

A. No.

Q. What led you to not be worried that Werner would never think you would be an unsafe driver based on the amount of accidents and tickets you had?

A. The length of time between accidents and my previous record with them, and the fact that I was a driving instructor with them for almost three years.

Q. Would it also be true that in spite of all the accidents and tickets you had, no one ever complained to you about it from Werner, so that led you to believe it was not a concern of theirs?

A. Correct.

Q. Okay. In other words, because it was never brought to your attention by Werner that they were unhappy with the amount of accidents or tickets, you didn't think you had anything to worry about in terms of your employment or owner-operator relationship with Werner.

A.  No.
Q.  Okay.  Now, is it correct that if you were
    demonstrating to Werner that you were an unsafe
    driver, you knew they could terminate your
    employment relationship?
A.  Yes.
Q.  And if you demonstrated to them, you know, by your
    driving record or habits, that you were an unsafe
    driver, they could terminate your owner-operator
    agreement.
A.  Yes.
Q.  Okay.  And was it your understanding they could
     terminate it effective immediately?
A.  Yes.
(S. Cohen, pp. 84, ll. 16-25, pp. 85, ll. 1-21, 25 and pp. 86, ll. 1-19)


Q.  And is it correct Werner never gave you a warning
     through anybody at Werner that they were concerned
     you had too many tickets or accidents?
A.  No.
(S. Cohen, pp. 86, ll. 24-25, pp 87, ll. 1-2)


**8.**     **Attached are computer print out forms showing 4 probations and 2 suspensions of
           Cohen.** (See exhibit 11)

**9**.     **Defendants' safety director expert composed his own list of accidents and traffic
           tickets.  His list contains 2 accidents and 2 speeding tickets not learned of by Art
           Atkinson, plaintiff's expert, and not on Art Atkinson's list of traffic
           tickets/accidents**. (See Exhibit 12)

**Excerpts from the expert report of  Plaintiff's Truck Company Safety Expert, Art Atkinson**

**10.**    **Art Atkinson's affidavit contains his expert reports which includes the following
           accident/citation list in bold print below showing Cohen's traffic tickets and
           accidents based on information contained the referenced Werner company
           documents.** (Exhibit 9) What is bracketed in italics has been superimposed onto
           Atkinson's bold report below  for purposes of this response.  The italicized information is
           based on Exhibits 11 and 12.
.

**COHEN PRE & POST WERNER EMPLOYMENT
ACCIDENT/CITATION RECORD**

| DATE | ACCIDENT/CITATION | RECORD SOURCE/BATES # |
|---|---|---|
| 6/19/97 | Backing & hit building | England 0345, 0310, 0347 |
| 8/11/97 | J-Knife while backing | England 0345, 0310, 0347 |
| 10/3/97 | Backed into stop sign | England 0345, 0310, 0347 |
| 1998 | Backing in Colorado | 4/3/00  0283, 0282, 0278 tele-application |
| 1998 | SPEED | 4/3/00   0283, 0282, 0278 tele-application |
| 2/24/98 | Fail. to obey traffic ctrl. device | DAC 0332, 0333, 0322 |
| 4/30/99 | R/T Squeeze at Florilli | bgck 0341, 0300 |
| 1999 | Hit parked semi in S. Carolina | 7/19/00 tele-app 0282 |

*3-11-2000   SPEED -Ohio -tele app- per def's expert - not noted on plnt expert's list (Exhibit 12)*

*[Cohen hired by Werner in July of 2000]*

| | | |
|---|---|---|
| 5/30/01 | Improper turn at stop light (fail to yield) | DAC 0324 11/18/03 App 0275 |
| 3/20/02 | SPEED | DAC 0324, 0325, 0326, 0327 |

*5-30-02 accident-ruts at job site -per def's expert-not noted on pltf expert's list, see Werner 0817 (Exhibit 11)*

*[6-6-02 30 days probation, see  Werner 0817 (Exhibit 11)]*

| | | |
|---|---|---|
| 7/9/02 | Failure to use seat belt | DAC 0324, 0325, 0326, 0327 |
| 3/03 | SPEED   (California) | Viol. Record 0354 11/18/03 App 0275 |
| 3/18/03 | Accident #142529 | Accident Review 000818 |
| 3/21/03 | SPEED   (Ohio) | DAC 0324, 0325, 0326, 0327 |
| 4/22/03 | Backing | 11/18/03 App 0275 |
| 6/8/03 | Sideswipe | 11/18/03 App 0275 |
| 6/11/03 | Suspension | DAC 0324, 0325, 0326, 0327 |
| 7/14/03 | Rollover | 11/18/03 App 0275 |

*[Cohen placed on one year probation, 30 days suspension without pay, 180 days training suspension, see Werner 1423 , and 0819 (See Exhibit 11)]*

| 8/03 | **SPEED   (Texas)** | **Violation Record 0356** |

*11-14-03 Accident hit while parked t app- per def's expert-not noted on pltf expert's list (Exhibit 12)*

| 1/2/04 | **SPEED** | **DAC 0331, 0328, 0330, 0321** |
| 4/26/04 | **SPEED   (Arkansas)** | **Violation Record 0356** |
| 8/16/04 | **Failure to weigh at station** | **DAC 0331, 0328, 0330, 0321** |
| 2/25/05 | **Accident** | **Accident Review 000822** |

*[2-25-05 45 days probation, see Werner 0822 (Exhibit 11)]*

| 8/05 | **SPEED   (Louisiana)** | **Violation Record 0357** |
| 5/22/06 | **SPEED** | **DAC 0331, 0328, 0330, 0321** |
| 10/9/06 | **Accident Top TLR#2006279489** | **Accident Review 000823** |

*[10-9-06  30 days probation, see Werner 0824 (Exhibit 11)]*

*11-6-06  SPEED  per defendant's expert - not noted on plaintiff expert's list* (Exhibit 12)

| **Unknown** | **Acc. Construction Zone #128648** | **Accident Review 000817** |
| **Unknown** | **Accident #149355** | **Accident Review 000819** |

**TOTAL 6/97 – 10/06**

| **Moving Violations** | **Accidents** |
| **11** | **14** |

*[13 including from def's expert's]*          *[16 if include from def's expert's ]*

**Non-Moving Safety**
**1**
**Non-Moving**
**1**
**TOTAL 25 in (9) years = 2.78/year average**

*[TOTAL 29 in (9) years = 3.22/ year average if included from def's expert]*

**11.     *Art Atkinson's affidavit contains his expert report which states as follows*:**  *(Exhibit 9)*

1.) It is my opinion that Werner was grossly negligent and reckless in its selection and hire of Cohen for the following reasons:

a.) Werner deliberately selected and hired Cohen with full knowledge that he had no less than two (2) moving violation convictions and had been involved in eight (8) preventable accidents. A total of ten (10) unsafe incidences in approximately three (3) years prior to his application for employment at Werner totaling an average of (3.33) unsafe incidences per year.
~ See Werner bates #0275, 0278, 0282, 0283, 0353, 0356, 0357,0320-0333.

b.) As such, Werner violated the transportation industry's standard of care as it relates to the selection and hiring of a professional commercial motor carrier driver known as the "Rule of Three." The Rule of Three basically states that a driver is highly suspect for consideration of hire, if he or she has more than a combined total of three (3) convictions for moving citations or preventable accidents in a three (3) year period preceding their consideration for employment.
~ See Example "B"

c.) Werner knew or should have known that Cohen's citation conviction and preventable accident. history overwhelmingly represented a pattern of unsafe and reckless conduct. This is particularly so when we consider that most, if not all, of the ten (10) incidences occurred while Cohen was operating a commercial vehicle.

2.) It is my opinion that Werner was grossly negligent in its continued retention of Cohen after his initial hire. Their decision to do so constitutes a wanton or reckless disregard for the rights and safety of the general motoring public, for the following reasons:

a.) Werner knew of Cohen's outrageous unsafe and reckless pattern of conduct in a commercial vehicle prior to his hire and continued to be aware of his ongoing reckless conduct in the following six (6) years after his hire. A violation of FMCSR (Part 390.11).
~ see Werner bates #0275, 0278, 0283, 0353, 0356, 0357, 0320--0333,0310,0341,0345,0347,0348.
~ See Cohen Depo Pg. #75, 76, 77.

b.) Werner knew from the year that they hired Cohen in 2000 until 2006, that he had been convicted of ten (10) moving violations, two (2) non-moving safety violations and had been involved in at least,

four (4) preventable accidents, totaling sixteen (16) separate events resulting in an average of (2.66) unsafe events per year.
~ See (a.) above

c.) Werner knew that in the three (3) years prior and the six (6) years after their choice to hire and retain Cohen, he had been involved in no less than, twenty-six (26) separate unsafe events resulting in an average of (2.88) unsafe events per year.
~ See (a.) above

**Excerpts of trucking literature from the expert report of
Plaintiff's Truck Company Safety Expert, Art Atkinson**

12.    **Plaintiff expert Art Atkinson's affidavit contains his expert report which has attached Example B, which is trucking literature that states as follows**: (Exhibit 9)

Historical Facts and Standard

a)      History Shows That Us That Did It - - Still Do
b)      Preventable or Not - The Standard.
c)      In Most Accidents – I Never Saw Them - Sight

3 small = 1 BIG ACCIDENT"

13.    **Plaintiff expert Art Atkinson's affidavit contains his expert report which has attached  Example B, which contain truck literature that states as follows**:  (Exhibit 9)

INDUSTRY STANDARD

Accidents/Citations: First, the motor fleet and motor carrier industry has long since established that a driver who has a combination of more than three citations and/or preventable accidents within three years prior to their possible employment, takes the position of being highly questionable relative to such employment.  It does not preclude drivers from being selected.  However, it does bring their ultimate selection as an employee into serious question and usually requires a motor carrier to go beyond the normal activity in selecting a driver - if such a driver is selected for employment or contract.

1.      If a driver does anything whatsoever to cause an accident, the accident will be classified as "preventable."

2.      Secondly, a driver must have done everything humanly possible to avoid

the accident, up to and including anticipation of its occurrence.

**Excerpts from the deposition of Plaintiff's Truck Company  Safety Expert, Art Atkinson**

**14.     Art Atkinson testified in his deposition as follows:** (Exhibit 10)


A.   Well, I think the criticism I would have at this
      time deals with the case at hand or in chief.  And that is
      there's no definitive policy as relates to the selection
      and hiring of drivers concerning the number of citations
      and/or preventable accidents that would either preclude
      them from being hired or would preclude them from being
      continued in employment that is in detail.
(A. Atkinson, pp. 11, ll. 8-14)


   But when you
   look at the totality of the accidents of Mr. Cohen, it is
   an absolute predictor.  It is a pattern of conduct.
(A. Atkinson, pp. 55, ll. 16-18)


Q.   Is a proper reaction retraining, suspension and
      disciplinary issues like that?
A.   Early on, I would agree.  However, over the
      totality of the time he was there, he's obviously not
      understanding or getting the material or he's choosing not
      to do as Werner is training him.  In other words, we do
      this training but nothing happens and nothing changes
      relative to his conduct.
   And Einstein declared that the term for it or the
   definition of insanity is continuing to do the same thing
   expecting a different result.  And that's simply not
   having here.  So their attempts of training and suspension
   and other items as single stand-alones are absolutely
   appropriate.
   However, when you look at the totality, they have
   seriously dropped the ball and did so deliberately in my
   opinion.  The pattern of conduct that's unsafe is
   overwhelming and consistent over a long period of time.
(A. Atkinson, pp. 92, ll. 5-22)


   However, when you look at the totality of it,
   they continue doing the same thing.  And he again

re-violates, and they do the same thing again.
Mr. Cohen testified that -- and I'm going to
paraphrase -- that, in effect, they didn't take any real
umbrage at what he's doing.  In fact, on page 83 through
85, he said that seven years no one at Werner told him
that they were concerned with the amount of tickets or
accidents he had accumulated.  And he was never worried
that they would think he had accumulated too many tickets
or accidents and think that he was an unsafe driver.
How could he not except that they're
demonstrating consistently over a long period of time that
that's their opinion.  You have a problem.  You get a
ticket.  You have an accident.  We're going to counsel
you.  We're going to give you a suspension or a warning,
but you're going to keep driving for us and making both of
us money.  What else is he supposed to assume?

Q.  And so your opinion in counseling and suspending
the driver is not sufficient for the driver of Mr. Cohen's
nature?

A.   With the record that he has, no.  His
disciplinary cycle should have continued to accelerate up
to and including termination long before this accident, in
fact, probably years before this accident occurred.

Q.  When should he have been terminated in your
opinion?

A.  Well, after he's hired in 2000, in May of 2001,
he's convicted of an improper term at a stoplight, a type
of failure to yield.  In 2002, he's speeding again.  In
2003, he's speeding also again.  Any one of those years,
he should have been terminated when you look at the
totality or break any of these down in three-year
increments.
And remember under part 391.25, the company has a
nondelegable duty to consider any and all evidence of his
careless behavior.  And this is a clear pattern of conduct
that is unsafe that extends for a great number of years,
nine, as a matter of fact, with almost out interruption
except in 2000.

(A. Atkinson, pp. 97, ll. 23-25, to pp. 99, ll. 1-12)


And now when they
continue to intervene in each incremental time and he
doesn't change his actions or his demeanor, then it
becomes even more abundantly clear to them, or it should
that, he is either not understanding or getting the

material, he's not reacting appropriately to the
discipline.
  And out of an abundance of caution for the sake
of the general public, they must assume worst case
scenario that he is choosing not to get it and sever ties
and not hand him the keys to a large and heavy vehicle or
sooner or later he's going to make the same kind of
substandard choices and it's going to cost someone life or
limb.
(A. Atkinson, pp. 100, ll. 21-25 to pp 101, ll. 1-9)


  And he's on a one-year probation.  And we know
that between those times he has several more incidents and
accidents and he's on probation.  So what good is it to
put him on probation, which one would reasonably assume
means that if you mess up again in the same manner, you're
terminated?  But they're not reacting to that.  They
continue on year after year with this counseling and a
suspension or a probationary status.  And he continues on
dutifully year after year every single year except 2000
doing the same thing he has always done since 1997.
(A. Atkinson, pp. 102, ll. 7-16)


## ARGUMENT AND AUTHORITIES

**A.  Plaintiff has significant probative evidence in support of his claim that
defendant Werner negligently hired and negligently retained Defendant Cohen.**

An employer has a duty to use reasonable care in the selection and retention of

employees. The duty was stated by the court in *Beam v. Concord*, 1994 U.S. Dist. LEXIS 4615,

as follows:

> ...Kansas has long recognized a cause of action for an employer's negligent hiring
> and/or retention of an unfit or incompetent employee....The negligent hiring and/or
> retention doctrine recognizes that an employer has a duty to use reasonable care in
> the selection and retention of employees.  This duty requires that an employer hire
> and retain only **safe** and competent employees.  An employer breaches this duty
> when it hires or retains employees that it knows or should know are
> incompetent...(emphasis added)

Cohen demonstrated a longstanding pattern of unsafe driving. He had at least fourteen

accidents and eleven moving violations in nine years. After ten chargeable accidents and six tickets (see citation/accident list in paragraph 9 above), Cohen was placed on the most severe probation (one year) and suspension (30 days without pay).

Werner was aware of Cohen's unsafe driving via annual reviews, accident reviews, and its disciplinary actions. Additionally, each unsafe incident listed on plaintiff's expert list of traffic citations/accidents refers to the documents contained in Werner's file. After Werner hired Cohen in spite of his unsafe record, Cohen later received four probations and two suspensions due to the company's recognition of his persistent unsafe driving. The severity of the discipline given to Cohen evidences Werner's recognition of Cohen's repeated incidents of unsafe driving. Werner knew that during Cohen's one year probation, Cohen got three speeding tickets and one chargeable accident. Cohen was not disciplined by Werner for these additional four violations while on probation.

Werner knew or should have known its disciplinary measures were not working when Cohen got the three speeding tickets and one chargeable accident while on Werner's lengthiest possible probation. Recognizing that probations and suspensions were not working to alter Cohen's driving behavior, the only remaining alternative was termination. Termination should have been the only Werner response for any one of Cohen's four violations while on probation. Instead, Werner failed to use reasonable care by choosing to retain Cohen while he committed four violations during his probation.

Subsequent to these four violations, Cohen got three more speeding tickets and three more chargeable accidents before the Stalling's collision. Again, there was no termination of Cohen for any of these additional six unsafe events. In the approximate 3 ½ years before the Stalling's collision, Cohen had approximately ten unsafe driving incidents. Werner had ten

chances to terminate Cohen.  Werner failed repeatedly to use reasonable care and negligently retained Cohen after each of the ten unsafe events.

Werner's brief suggested that giving four probations and two suspensions to Cohen demonstrated reasonable response to the many unsafe events.  Actually, Werner's four probations and two suspensions demonstrates Werner's awareness of Cohen's  pattern of unsafe driving even before Cohen committed his next ten unsafe driving events.

Cohen testified Werner never told him it was "concerned about the amount of accidents," nor "concerned about the amount of tickets," and that Werner never "gave him a warning." Cohen testified that Werner was not "unhappy" with his driving record, and that he was not concerned his unsafe driving would "affect his employment or owner-operator relationship" with Werner. This evidence shows Werner's mind-set of acceptance of Cohen as an unsafe driver with no intention to terminate him no matter how many traffic tickets, accidents and disciplinary measures.  Cohen's testimony establishes that Werner negligently chose to not terminate. Werner was willing to expose the public to an unnecessary risk of harm from its unsafe driver. The goal of a reasonably  prudent truck company is to terminate the unsafe driver before, not after,  he causes an injury accident.

Defendant's brief  suggested Werner's compliance with the FMCSR in hiring Cohen exculpates Werner. The FMCSR's require only a minimal paperwork investigation be performed to obtain information concerning the driver's history. The FMCSR does not provide a guideline on whether to hire or retain the driver. That decision is left to the employer who is to use reasonable  care.

There is no authority that has held that compliance with the FMCSR demonstrates reasonable care.  In its brief, defendant cited *Hutcherson* for that supposed  proposition.

*Hutcherson* relied on "the standard of the ordinarily prudent man" and "industry custom" and allowed the negligent hiring and retention claim regardless of compliance with federal regulations.

On page 9 of its brief, Defendant cited *Meyer* for supposed support.  *Meyer*'s dealt only with a punitive damages claim and allowed the claim even if there was compliance with the FMCSR.

Although Werner reviewed  Cohen's  motor vehicle record, gave Cohen a drug test, and had Cohen undergo a  physical exam, that does not in any way tell us whether Cohen was a safe enough driver to be hired and retained.

Taken in the light most favorable to the plaintiff, plaintiff has presented sufficient evidence of negligent hiring and retention to submit the case to the jury.

**B. Although Werner has admitted vicarious liability for defendant Cohen's negligence, plaintiff is still entitled to bring a claim for negligent hiring and retention**.

The law in Kansas is that a claim for negligent hiring and retention can be brought against defendant Werner even though defendant Werner has admitted vicarious liability.

In *Marquis v. State Farm Fire and Casualty Co.*, 1998 Kan. LEXIS 379,  the overview to the case states, "The court held that an admission that an employee was acting within the scope of employment did not preclude an action for both respondeat superior and negligent entrustment or negligent hiring, retention, or supervision."

On page 329, the Court in *Marquis* stated,

The negligence alleged in this case is that of negligent supervision, hiring, or retention, which is negligence separate and distinct from negligence of the driver whose action caused the injury.  Negligent supervision, hiring, or retention is a recognized cause of action under Kansas law; its focus is upon the actions of  someone other that the person whose negligence caused the injury.

The *Marquis* court further stated on page 331:

Theories of negligent supervision or control and negligent hiring or negligent retention of employees are separate and distinct from theories of liability of negligent entrustment.  Negligent entrustment occurs when an owner of an automobile allows a third party to drive it while knowing the driver to be incompetent, careless, or reckless.

The *Marquis* court further stated on page 333,

The final argument made by State Farm is that the plaintiffs were barred from proceeding against Sharon Auck under the theory of negligent hiring, retention, or supervision because State Farm had already admitted that Jerry Auck was an employee acting within the scope of his employment and, therefore, the respondeat superior liability of Sharon Auck had already been established. In support of this position, State Farm cites a recent Missouri case, *McHaffie v. Bunch*, 891 S.W. 2d 822 (Mo. 1995.)

The *Marquis* court further stated on page 334-335,

*However, other jurisdictions, including Kansas, have found that an admission that the employee was acting within the scope of his or her employment does not preclude an action for both respondeat superior and negligent entrustment or negligent hiring, retention, or supervision....These cases rest on the proposition that negligent entrustment and negligent hiring, retention, or supervision are torts distinct from respondeat superior and that liability is not imputed but instead runs directly from the employer to the person injured.*  (Emphasis Added).

For more recent authority, see  *Becker v. Estes Express Lines, Inc.*, 2008 U.S. Dist. LEXIS 20400. *Becker* states in the overview, "Also, the court rejected the company's argument that plaintiff's claims for negligent entrustment and negligent hiring, supervision, and retention had to be dismissed based on the fact that the company had admitted to respondeat superior liability."

On  page 9, the *Becker* court ruled,

However, other jurisdictions have held that an admission of vicarious liability does not preclude causes of action for negligent entrustment, hiring, retention, or supervision. See, e.g., *Marquis v. State Farm Fire & Cas. Co.*, 265 Kan.317, 961P.2d 1213, 1224-5 (Kan.1998); *Lim v. Interstate Sys. Steel Div. Inc.*, 435 N.W.2d 830, 833 (Minn.1989); *Fairshter v. Am. Nat'l Red Cross*, 322 F.Supp. 2d 646, 654 (E.D. Va.2004) (applying Virginia law).

These jurisdictions reason that liability under theories of negligent entrustment, hiring, supervision, training, and retention the employer's liability is direct and not derivative. These theories do not rest on the employer-employee relationship, but rather involve the employer's own negligence in entrusting, hiring, supervising, training, or retaining an employee with knowledge, either actual or constructive, that the employee posed a risk of harm to others. **Therefore, a plaintiff must be allowed to proceed under both respondeat superior, a theory of imputed liability, and negligent entrustment, hiring, supervision, training, retention, theories of direct liability, when the employer admits the agency of the alleged tortfeasor.** (Emphasis Added).

On page12, the *Becker* court held:

Based on the foregoing, the court finds that the claims can proceed in the same action. Therefore, the court declines to grant the Defendant's motion for summary judgment on the Plaintiff's negligent entrustment and negligent hiring, supervision, and retention claims on the ground that the Defendant has admitted vicarious liability.

Judge Lungstrum of Federal District Court in Kansas City ruled in support of plaintiff's claim in *Patterson v Dahlsten*, 130F. Supp. 2d 1228, (2000), by stating as follows:

The court stated, however, that "other jurisdictions, including Kansas, have found that an admission that the employee was acting within the scope of his or her employment does not preclude an action for both respondeat superior and negligent entrustment or negligent hiring, retention, or supervision."

The court ruled that, in Kansas, the torts of negligent hiring, retention, or supervision are torts "distinct from respondeat superior," as they are "not derivative of the employee's negligence." 961 P.2d at 1225. "Liability is not imputed, but instead runs directly from the employer to the person injured." Id. See also, *Miller v. Dillard's Inc.*, 47 F. Supp. 2d 1294, 1299 (D. Kan. 1999) ("Even if the employer admits the employee was acting within the scope of his or her employment, the plaintiff may still bring an action for both respondeat superior and negligent hiring, retention, or supervision.")

The Kansas Supreme Court's decision in *Marquis* clearly negates *Dahlsten*'s argument in support of its motion for summary judgement. **Applying Kansas law, the court finds that Dahlsten's concession of respondeat superior liability does not preclude plaintiff from proceeding on separate claims against Dahlstein for negligent hiring, training, retention, or supervision.** (Emphasis Added).

Because the torts of negligent hiring, retention, or supervision are recognized in Kansas as separate torts that are not derivative of the employee's negligence, an

admission that the employee was acting within the scope of his or her employment does not preclude an action for both respondeat superior and negligent entrustment or negligent hiring, retention, or supervision.  See *Kansas State Bank & Tr. Co., v. Specialized Transportation Services, Inc*., 249 Kan. at 362. State Farm's admission in this case that Jerry Auck was an employee acting within the scope of his employment at the time of the accident does not prohibit the plaintiffs from maintaining an action based on claims of negligent hiring, retention, or supervision.

Contrary to defendant's unfounded concern about a recovery of double damages, it is impossible for there to be a double  recovery under Kansas' comparative fault laws. The jury will determine the amount of plaintiff's damages on the form of the verdict. The amount of damages attributed to each defendant will be determined by the allocation of comparative fault on the verdict form.

<u>CONCLUSION</u>

Plaintiff has presented sufficient evidence showing negligent hiring and retention to bring his claim.

Kansas law clearly allows a negligent hiring and retention claim to exist concomitant with defendant Werner's admission of vicarious liability.

Respectfully submitted,

/s/ Bradley J. Prochaska
Bradley J. Prochaska - #10943
Prochaska, Giroux & Howell
7701 E. Kellogg, Suite 415
Wichita, KS 67207
P:  316 683-9080
F:  316 683-6508
Attorneys for Plaintiff

27

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2008, the Foregoing  Plaintiff's  Response  to

Defendant   Werner  Enterprises,  Inc.'S  Motion  for Partial Summary Judgement on  Plaintiff's

Claim  for   Negligent Hiring and Retention  was electronically filed with the Clerk of Court using

the CM/ECF system, which shall send notification of such filing to all counsel of record.

Michael McDaniel
Coffey, Gudgel & McDaniel, LLC
4725 East 91st Street, Suite 100
Tulsa OK 74137
michael@cghlawok.com
Attorney for Defendants

                                    Respectfully submitted,

                                     /s/ Bradley J. Prochaska
                                    Bradley J. Prochaska #KS 10943
                                    7701 E. Kellogg, Suite 415
                                    Wichita, KS 67207
                                    316-683-9080
                                    316-683-6508
                                    brad@pgh-law.com
                                    Attorneys for Plaintiff